UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FROST BROWN TODD LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-2784_____ |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES | ) | |
| | ) | |
| Centers for Medicare and Medicaid | ) | |
| Services, | ) | |
| | ) | |
| Defendant. | | |

## COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Frost Brown Todd LLC ("FBT"), by counsel and pursuant to the Freedom of Information Act, 5 U.S.C. § 552 *et seq.* ("FOIA"), brings this action for injunctive relief for the failure of the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") to provide agency records in response to FBT's proper requests, and states as follows:

### PRELIMINARY STATEMENT

1.      In May 2018, FBT issued FOIA requests to CMS.  At CMS's demand, in August 2018, FBT paid CMS a $120,000 advance fee to review and produce responsive documents.  Over the ensuing three years, however, CMS has produced a miniscule volume of documents (93 total)—most of which are publicly-available—and inappropriately withheld all or portions of documents.  CMS has violated the FOIA statute and its own FOIA production guidelines.  CMS has ignored FBT's repeated written requests to remedy CMS's deficient and delayed productions. CMS's inaction is part of the agency's long-standing pattern and practice of violating FOIA.  FBT

asks this Court to order CMS to cease its FOIA violations and produce the requested documents to FBT in full.

## JURISDICTION AND VENUE

2.     The Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

3.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

4.     FBT has exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

## PARTIES

5.     FBT is a law firm organized as a limited liability company with fifteen offices across the United States, including an office in Washington, D.C.

6.     Defendant CMS is an agency of the United States, and it has possession of and/or control over the documents that FBT seeks in its FOIA requests identified below. The CMS FOIA Office is located in Baltimore, Maryland.

## THE FREEDOM OF INFORMATION ACT

7.     Congress enacted FOIA with the purpose of promoting government transparency.

8.     Pursuant to 5 U.S.C. § 552(a)(3)(A), an agency is required to make records promptly available to any person who submits a FOIA request that reasonably describes such records and is made in accordance with the agency's published rules.

9.     Pursuant to 5 U.S.C. § 552(a)(6)(A)(i), CMS has twenty (20) business days after receipt to determine whether it will comply with a FOIA request.  Under certain circumstances, an agency may extend the time limit to up to thirty (30) working days by written notice to the requester. 5 U.S.C. § 552(a)(6)(B)(i).

10.     CMS has adopted a FOIA Policy and Procedures Guide, titled "Processing Requirements for All Agency Staff and Contractors—High Priority Issues: Organizing Responsive Records by Item (labeling and bundling)." CMS's FOIA Policy and Procedures Guide requires the agency to label records in relation to each item on the request:

> FOIA requests frequently contain lists of multiple categories of records being requested. When providing responsive records to multi-item FOIA requests, the providing office(s) must organize the records in relation to each separate item on the request and label them accordingly, for ease of reference and analysis.

CMS, *Freedom of Information Act (FOIA) Policy and Procedural Instructions* § 30.14(A) at 17 (Jan. 24, 2012).[1]

11.     Further, CMS carries the burden of asserting a privilege under which CMS withholds responsive documents. *See Reporters Committee for Freedom of the Press v. FBI*, (case no. 20-5091, July 2, 2021). To assert the deliberative process privilege (FOIA Exemption 5(b)(6)), CMS must show a specific foreseeable harm that would—not just could—result from the disclosure of the contested documents. *Id.* at 29.

12.     As described in more detail below, CMS has failed to comply with the FOIA statute, its own Policy and Procedures Guide, and legal requirements for withholding responsive documents.

## FACTUAL BACKGROUND

### *FBT's FOIA Requests*

13.     By letters dated May 21, 2018, FBT mailed via overnight delivery and emailed to FOIA_Request@cms.hhs.gov six separate FOIA requests to the CMS FOIA officer in Baltimore,

---

[1]   https://www.cms.gov/regulations-and-guidance/legislation/foia/downloads/foiaprocessingpolicyproceduresguide-.pdf.

Maryland.  The FOIA requests are attached as Exhibits A–F (collectively, "FOIA Requests"; individually, "FOIA Requests One through Six").

14.     FBT's FOIA requests seek documents related to the Medicare program, including documents relating to Traditional Medicare, Medicare Advantage, the Medicare Advantage payment model, the Risk Adjustment Processing System ("RAPS") filter logic, and the process by which CMS sets payment rates and accepts bids from participating Medicare Advantage Organizations ("MAOs") that offer Medicare Advantage benefits.

15.     FOIA Request One (CMS Control No. 052320187007) seeks categories of documents that relate to (1) documents produced, or planned to be produced in response to other identified FOIA requests or other FOIA requests relating to the identified topics; (2) documents disclosed by CMS to the Government Accountability Office for the purposes of preparing a report relating to Medicare Advantage; and (3) documents for matters where the government has asserted that the submission of invalid or unsupported diagnosis codes or risk adjustment data by MAOs or MAO providers violated the False Claims Act.  A true and accurate copy of FOIA Request One is attached as Exhibit A.

16.     In large part, FOIA Request One seeks documents that CMS already has produced in response to other FOIA requests or in relevant litigation, so such documents should be readily available for CMS to produce to FBT. CMS's response letters indicate that it was producing documents falling within the scope of this request, but it did not identify which documents relate to FOIA Request One and did not indicate that such production of responsive documents was complete. In fact, CMS made 21 interim productions to another FOIA requester, Petrillo & Powell, PLLC ("Petrillo") during FOIA litigation filed by Petrillo against CMS. *See Petrillo & Powell, PLLC v. U.S. Dept of Health and Human Services*, Case 1:17-cv-00663-KBJ. Yet FBT has

received only 7 interim productions since May 2018. Clearly, CMS has not produced all the documents responsive to FOIA Request One.

17.     FOIA Request Two (CMS Control No. 052220187046) generally seeks documents that relate to Medicare Risk Adjustment Attestations and Compliance submitted by MAOs to CMS, CMS's intended application of a fee-for-service Adjuster ("FFS Adjuster"), documents related to the calculation of an FFS Adjuster and/or data files underlying such calculations, and final reconciliation payments.  A true and accurate copy of FOIA Request Two is attached as Exhibit B.

18.     CMS has not identified the produced documents, if any, that are responsive to FOIA Request Two.

19.     FOIA Request Three (CMS Control No. 052220187048) generally seeks documents reflecting regulatory requirements, guidance, training, and other materials, related to evaluating diagnosis coding accuracy in Medicare risk adjustment data reported by providers and MAOs.  A true and accurate copy of FOIA Request Three is attached as Exhibit C.

20.     CMS appears to have produced a limited number of documents responsive to FOIA Request Three but has not specifically identified those documents in its interim productions.

21.     FOIA Request Four (CMS Control No. 052320187010) generally seeks documents related to CMS's Medicare Managed Care Manual, filter logic guidance, and Risk Adjustment Validation audits, MAO bid submissions to CMS, and CMS's statutory coding intensity adjustment.  A true and accurate copy of FOIA Request Four is attached as Exhibit D.

22.     CMS has not identified the produced documents, if any, that are responsive to FOIA Request Four.

23.     FOIA Request Five (CMS Control No. 052220187050) generally seeks documents related to CMS proposed regulations and oversight related to overpayments, the Part C Overpayment Rule, and related to the statutory actuarial equivalence requirement.  A true and accurate copy of FOIA Request Five is attached as Exhibit E.

24.     CMS has not identified the produced documents, if any, that are responsive to FOIA Request Five.

25.     FOIA Request Six (CMS Control No. 052320187013) generally seeks documents related to Medicare risk adjustment retrospective chart reviews, work groups related to retrospective chart reviews, and CMS's decision not to finalize a 2014 proposed chart review rule. A true and accurate copy of FOIA Request Six is attached as Exhibit F.

26.     CMS has not identified the produced documents, if any, that are responsive to FOIA Request Six.

27.     Rather than producing documents responsive to the aforementioned FOIA requests, CMS produced only 93 documents (totaling fewer than ten thousand pages), almost entirely comprised of publicly-available materials. The remainder of CMS's productions consists of generally unresponsive documents.

***Medicare, Medicare Advantage, RAPS Filter Logic, MA Payment Model, and Bid Process***

28.     Medicare is the federal health insurance program for people who are 65 or older, individuals with disabilities, and individuals with end-stage renal disease.  The different parts of Medicare help cover specific services and are identified as follows: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage); and Medicare Part D (prescription drug coverage).

29.     Medicare Advantage ("MA"), also known as Part C, is a private-public partnership created in 2003, in which private health insurers provide health insurance and other benefits to qualified Medicare beneficiaries who elect MA coverage.  MA allows beneficiaries to enroll in health insurance plans administered by Medical Advantage Organizations ("MAOs") instead of receiving their care through Medicare Parts A and B ("Traditional Medicare").

30.     Congress has charged CMS, an agency of the U.S. Department of Health and Human Services ("HHS"), with administering the MA program, including the authority to determine the precise method for compensating MAOs.

31.     FBT's FOIA Requests focus on documents related to CMS's administration of the MA program.

32.     The payment systems for Traditional Medicare and MA differ significantly.  Under Traditional Medicare, CMS directly reimburses physicians and other healthcare providers on a "fee-for-service" basis.  In doing so, CMS compensates healthcare providers *retrospectively* for services already rendered to beneficiaries.  This payment model rewards providers for the *quantity* of services provided.

33.     Under MA, however, CMS enters into contracts with an MAO where CMS pays monthly capitated premiums based on the MAO's anticipated costs for providing care to its members.  42 U.S.C. § 1395w-23.  Thus, in MA, CMS compensates MAOs *prospectively* based on the estimated cost of care for the MAO's members during the next year.  CMS pays MAOs more for members who, based on each member's prior year health profiles, are more likely to incur additional healthcare costs relative to the average MA beneficiary.  CMS, Medicare Managed Care Manual, Chapter 7, § 70.1 and 70.5.1 (2014).  MAOs bear the actual cost of paying healthcare providers with whom they contract to deliver care to members.

34.     After an MA member is seen by a healthcare provider, the provider submits a claim to an MAO for reimbursement.  MAOs, in turn, process the claim to ensure that certain data elements are eligible for submission to CMS, and then submit the data (including diagnosis codes) to CMS through CMS's electronic data systems—RAPS and Encounter Data Processing System— consistent with CMS data submission guidelines.  For RAPS data submission, MAOs must implement an algorithm that only submits data elements that are eligible for risk adjustment.  This is referred to as RAPS "filter logic."

35.     Because CMS compensates medical care providers who treat Traditional Medicare beneficiaries based on the *services* and *procedures* that they provide their patients, regardless of the number of diagnosis codes that they submit on the associated claims for payment, Medicare FFS diagnosis code submissions are less complete or "intense" than MAOs' diagnosis code submissions.

36.     Congress recognized that this so-called "coding intensity" may vary between the MA and Traditional Medicare programs and, in 2005, adopted a "coding intensity adjustment" or "CIA" as a prospective, uniform reduction in the premium rates paid to MAOs.  Congress authorized CMS to assess this annual CIA up to a specified statutory maximum.  CMS determines the CIA based on a periodic evaluation of the difference in coding intensity between the MA and Traditional Medicare programs and applies the CIA across-the-board to reduce MAO payments. *See* 42 U.S.C. § 1395w-23(a)(1)(C)(jj).

37.     The basic framework for premiums paid to MAOs is set by statute—the Social Security Act (the "SSA"), 42 U.S.C. §§ 1395, *et seq.*—and requires CMS to pay a capitated base rate established for the geographic area in which the MA plan operates, and then to adjust the base

rate according to the demographics and health characteristics of the actual beneficiary population that the MAO enrolls.

38.     CMS establishes the base rate on an annual basis through a bidding process.  Under this bidding mechanism, MAOs estimate the amount of money necessary to provide the Medicare benefits that are actuarially equivalent to the Traditional Medicare benefits for a pool of enrollees of average risk.  42 U.S.C. § 1395w-24(a)(6), (b)(1); 42 C.F.R. § 422.254(a)(1).  The MAO's bid must be "actuarially sound," and the MAO must furnish the "actuarial basis" for its projected revenue needs or else CMS cannot accept its bid.   42 U.S.C. § 1395w-24(a)(6)(A)(i); (a)(6)(A)(ii)(I),  (a)(6)(A)(iii).   CMS then calculates geographic benchmarks based on the aggregation of these bid and compares each MAO's bid to the relevant benchmark.  MAOs that bid less than the CMS benchmark are paid their bid amount as the monthly base rate, and MAOs that bid more than the CMS benchmark receive the benchmark rate as their base rate.  42 U.S.C. § 1395w-23(a)(1)(B); *see also* 42 U.S.C. § 1395w-2424a(c)(A)(iii), (a)(1)(B)(ii).

39.     Once CMS establishes an MAO's base rate for enrollees of average risk, the agency adjusts the rate to reflect the risk profile of the actual beneficiaries the MAO has enrolled.  As mandated by the SSA, this adjustment incorporates demographic characteristics like "age, disability status, gender, [and] institutional status," as well as information about the enrollees' "health status."  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).

40.     As described above, FBT's FOIA Requests seek production of documents related to Traditional Medicare, MA, RAPS filter logic, the MA payment model, and the bid process.  CMS is in possession, custody, or control of these documents and should produce them.

*Risk Adjustment, Actuarial Equivalence, and CMS Guidance*

41.     The process of adjusting payments to MAOs to account for anticipated cost of insuring members is known as "risk adjustment."  The primary purpose of risk adjustment is a system for paying beneficiaries that avoids creating incentives for MAOs to enroll only healthier beneficiaries.

42.     The risk adjustment process accounts for the health status of enrollees using the CMS Hierarchical Condition Category Model (CMS-HCC Model), which CMS adopted in 2004. Pope, G., *et al.*, EVALUATION OF THE CMS-HCC RISK ADJUSTMENT MODEL at 7 (Mar. 2011).  This model relies on diagnosis information primarily assigned by healthcare providers during face-to-face encounters with patients and submitted to MAOs during the claims reimbursement process. Applying the International Classification of Diseases manual ("ICD"), healthcare providers classify patient medical conditions into approximately 68,000 diagnosis codes.  *See* National Center for Health Statistics (under authorization by the World Health Organization) ICD-10-CM: INTERNATIONAL CLASSIFICATION OF DISEASES, TENTH REVISION, CLINICAL MODIFICATION (2017).[2]  CMS, in turn, groups many of these diagnosis codes into approximately 79 Hierarchical Condition Categories ("HCCs") that are used in risk adjustment for the MA program, based on similar characteristics and treatment costs.  *See* 2017 CMS Call Letter, at 79-82 (listing HCCs for calendar year 2017).

43.     CMS assigns each HCC a corresponding risk coefficient, developed based on CMS's experience paying for patients with a diagnosis in the same HCC in the Traditional

---

[2] MAOs submitted diagnosis code data using diagnoses codes in the 9th revision of this manual, ICD-9, for service dates up to and including September 30, 2015.  MAO diagnosis codes data for service dates on and after October 1, 2015, use diagnosis codes from ICD-10-CM.  *See* CMS, Advance Notice of Methodological Changes for Calendar Year (CY) 2016 for Medicare Advantage (MA) Capitation Rates, Part C and Part D Payment Policies and 2016 Call Letter, at 26 (Feb. 20, 2015).

Medicare program.  *See id.*  Healthcare providers treating beneficiaries covered by Traditional Medicare submit diagnostic information with their claims for reimbursement, as they do when treating MA patients.  CMS analyzes these diagnosis codes for the Traditional Medicare population, and the claims payments it has made in connection with those codes, to derive a risk coefficient for each HCC that reflects the marginal cost of treating patients with the relevant conditions.  CMS, Medicare Managed Care Manual, Chapter 7, § 70.1.

44.     Under the CMS HCC Model, a beneficiary may have more than one HCC based on the presence of multiple risk-adjusting health conditions.  In addition, a beneficiary will have risk coefficients corresponding to certain demographic factors.  In order to establish the final premium amount for a given MAO enrollee, CMS aggregates the risk coefficients from any applicable HCC along with those corresponding to the enrollee's demographic profile.  This overall "risk score" multiplied by the monthly base rate equals the premium amount that CMS will pay to the MAO.  These monthly premium rates, risk adjusted pursuant to the SSA, must be actuarially equivalent to the cost CMS expects to pay for these enrollees' benefits under Medicare FFS.  *See* 42 U.S.C. § 1395w-23(a)(1)(C)(i).

45.     CMS assigns a risk score of 1.000 for an enrollee of average risk.  Risk scores above 1.000 reflect beneficiaries with higher than average expected healthcare costs, for whom CMS will pay the MAO a correspondingly higher monthly premium.  Thus, for example, if a given enrollee's demographic and HCC-related risk coefficients result in an overall risk score of 1.500, and the base rate for the enrollee's plan is $1,000 per month, CMS will pay the MAO a monthly premium for this enrollee of $1,500.

46.     By statute, CMS not only must adjust MA premium payments "for such risk factors as . . . health status," it must do so in a manner that "ensure[s] actuarial equivalence." 42 U.S.C.

§ 1395w-23(a)(1)(C)(i).  In other words, the SSA requires CMS to compensate MAOs for a given

MA member in an amount that equals the costs CMS would incur in Traditional Medicare to

provide benefits to the same member.

47.    As described above, FBT's FOIA requests seek production of documents related to

risk adjustment and actuarial equivalence.  CMS has possession, custody, or control of these

documents and should produce them.

***MA Data Attestations, Compliance Program, and Medicare Managed Care Manual***

48.    A significant percentage of diagnosis codes submitted by healthcare providers in

traditional Medicare lack sufficient support in the medical record under CMS coding and

documentation standards.  Nevertheless, CMS uses these unsupported diagnosis codes to calculate

the risk coefficients for different medical conditions.

49.    Notwithstanding the fact that healthcare providers often make errors when

assigning diagnosis codes to their patients, CMS has promulgated an attestation regulation that

requires MAOs to certify "based on best knowledge, information, and belief" that the diagnosis

code data they have sent to CMS is accurate, complete, and truthful.  42 Fed. Reg. 422.504(*l*).

50.    CMS has yet to issue a regulation explaining how MAOs ought to ensure accuracy

or completeness of diagnosis code data.

51.    CMS's predecessor, the Health Care Financing Administration ("HCFA"), issued

commentary accompanying the final MA data attestation rule, explaining that the "best knowledge,

information, and belief" standard is "consistent with the standard of knowledge reflected in Federal

fraud statutes," namely "[a]ctual knowledge of falsity," "reckless disregard," or "deliberate

ignorance of information supporting the truth or falsity of a claim."  CMS Response to Comment

on Final Rule on Certification of Data that Determine Payment/Certification of the Accuracy of

ACR Information (§ 442.502(*l*)) (June 29, 2000).[3]  But HCFA did not prescribe any specific parameters for compliance with the attestation regulation, instead citing only a generalized "obligation to undertake 'due diligence'" and to "mak[e] good faith efforts" to certify the encounter data submitted.  *Id.*

52.     The Office of the Inspector General of the U.S. Department of Health & Human Services ("HHS-OIG") also promulgated non-binding advisory guidance on the "best knowledge, information, and belief" standard.    HHS-OIG's  Compliance  Program  Guidance  for Medicare+Choice Organizations Offering Coordinated Care Plans, 64 Fed Reg. 61,893 (Nov. 15, 1999).  HHS-OIG's advisory guidance spells out generalized obligations but does not impose specific parameters for a compliance program.   Rather, HHS-OIG noted that MAOs have "discretion" to "determine[]" the "exact methods" they will use to ensure compliance with the attestation requirement.  *Id.* at 61,900.

53.     CMS publishes guidance documents, like the Medicare Managed Care Manual, that include guidance on risk adjustment and compliance.  CMS, Medicare Managed Care Manual, Chs. 7 & 21.

54.     FBT's FOIA Requests seek production of CMS documents related to MA data attestations, compliance programs, and the Medicare Managed Care Manual.  CMS has possession, custody, or control of these documents and should produce them.

***CMS Risk Adjustment Validation Audits, and FFS Adjuster***

55.     CMS conducts Risk Adjustment Data Validation ("RADV") audits to "identify and correct past improper payments to Medicare providers." https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-

---

[3] https://www.federalregister.gov/documents/ 2000/06/29/00-15648/medicare-program-medicarechoice-program.

Program/Overview.  CMS conducts two types of RADV audits—national and contract-level.  MA plans selected for RADV audit are tasked with submitting to CMS medical record documentation supporting the diagnosis codes CMS is reviewing.  CMS has generated various regulatory materials regarding the RADV audit program.

56.    In July 2008, CMS announced that adjustments to payments based on contract-level RADV audit findings would no longer be limited to the enrollees that were audited but would be extrapolated to an MAO's entire contract using the sample error rate.

57.    In December 2010, CMS released a proposed methodology for extrapolating audit findings to contract-level payment adjustments without calibrating or adjusting the results against data errors in CMS's own FFS data, which is not audited against medical records—referred to as a "fee-for-service (FFS) adjuster" or "model calibration factor."  The MA industry submitted numerous comments protesting the proposed methodology and explaining why an FFS Adjuster was necessary before extrapolating RADV audit results across an MA contract.

58.    In February 2012, CMS released its final methodology for calculating and extrapolating payment errors for RADV audits.  In its final RADV audit methodology, CMS acknowledged MA industry concerns and promised to apply an FFS Adjuster before extrapolation to account for the fact that the documentation standard (medical records) used in RADV audits to determine a contract's payment error is different from the documentation standard (FFS claims) used to develop the Part C risk-adjustment model.  CMS, *Notice of Final Payment Error Calculation Methodology for Part C Medicare Advantage Risk Adjustment Data Validation Contact-Level Audits*, 4–5 (Feb. 24, 2012).[4]

---

[4]   https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/recovery-audit-program-parts-c-and-d/Other-Content-Types/RADV-Docs/RADV-Methodology.pdf.

59.     In November 2018, CMS retreated from its 2012 promise to issue an FFS Adjuster and published a proposed rule that would not adopt an FFS Adjuster before extrapolating contract-level RADV audit results.  The proposed rule was based on a CMS-commissioned study that found "that errors in FFS claims data do not have any systemic effect on the risk scores calculated by the CMS-HCC risk adjustment model, and therefore do not have any systemic effect on the payments made to" MAOs.  83 Fed. Reg. 54,982, 55,040 (Nov. 1, 2018) ("Proposed RADV Rule").

60.     When the Proposed RADV Rule was released, it was readily apparent that CMS had failed to disclose the information necessary to enable stakeholders to evaluate and respond to the study.  At the time, the only materials related to the study that were publicly available were two brief summaries published to CMS's website on or about October 26, 2018.  The data underlying the study had been withheld, the programming and other methodologies used had not been disclosed, and many critical questions remained unanswered.

61.     Several stakeholders promptly demanded that CMS produce the missing data and information regarding its study.

62.     The Administrative Procedure Act ("APA") requires that CMS provide full transparency regarding both the studies that allegedly support its policy proposals and those that do not.  *See, e.g.*, *Am. Radio Relay League, Inc. v. FCC,* 524 F.3d 227, 236 (D.C. Cir. 2008) ("[I]n order to allow for useful criticism, it is especially important for the agency to identify and make available *technical studies and data* that it has employed in reaching the decisions to propose particular rules.") (quoting *Conn. Light & Power Co. v. NRC,* 673 F.2d 525, 530 (D.C. Cir. 1982)). Policies established by CMS and the Department of Health and Human Services to implement the Data Quality Act similarly call for a high degree of transparency regarding studies that are intended to influence and inform important policy decisions. HHS, *Guidelines for Ensuring and Maximizing*

*the Quality, Objectivity, Utility, and Integrity of the Information Disseminated to the Public,* Part II(E), Section V(D) (Oct. 1, 2002) ("Data Quality Guidelines") ("If an agency is responsible for disseminating 'influential' information, guidelines for dissemination should include a high degree of transparency about data and methods to facilitate its reproducibility by qualified third parties. Information is considered influential if it will have a substantial impact on important public policies or important private sector decisions.").

63.     Recognizing its insufficient data release, CMS delayed the comment period deadline twice, promising to release additional data.  Although CMS released additional data on May 28, 2019, it remained insufficient to fully vet the study on which CMS's Proposed RADV Rule was based.

64.     Some stakeholders, like Sidley Austin LLP, filed FOIA requests to obtain the relevant information.  *See* Complaint, *Sidley Austin (DC) LLP v. Centers for Medicare & Medicaid Servs.*, Case 1:20-cv-01871 (D.D.C. July 7, 2020).  Sidley filed suit against CMS in July 2020 to force CMS's compliance with FOIA.  The Court in the *Sidley* matter has set several production deadlines with which CMS must comply, and the Court continues to monitor the litigation to ensure CMS's compliance.

65.     FBT's FOIA Requests similarly call for CMS to produce the documents related to CMS's development of the RADV rule.  Specifically, FBT's FOIA Requests Four and Six (CMS Control Nos. 052320187010 and 052320187013, respectively), discussed above, seek documents related to the underlying study and those related to CMS's development of the RADV rule.

66.     The 2018 Proposed RADV Rule was finalized on November 24, 2020.  45 C.F.R. § 153 (2020).

67.     As described above, FBT's FOIA Requests seek production of documents related to CMS RADV audits and associated agency rules, proposals, and guidance, including the study underlying the Proposed RADV Rule.   CMS has possession, custody, or control of these documents and should produce them.

***Two-Way Retrospective Chart Reviews***

68.     It is a standard industry practice for MAOs to review their enrollees' medical records to identify diagnosis codes that are properly supported under CMS coding and documentation standards but which healthcare providers failed to report.  These reviews are often referred to as "retrospective chart reviews."  CMS permits MAOs to submit diagnosis codes that they identify in the course of these retrospective chart reviews for risk adjustment purposes.

69.     In January 2014, CMS issued a notice of proposed rulemaking titled Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 1918-2073 (Jan. 10, 2014) at AR1 *et seq.*  In this notice, CMS proposed a rule that would have prohibited MAOs from conducting retrospective chart reviews to identify unreported diagnosis codes unless those reviews were also designed to confirm that all codes that healthcare providers previously assigned to their patients had adequate support in the medical records.  The proposed rule would have imposed a medical record documentation standard for MAO diagnosis code submissions that did not exist for diagnosis codes used by CMS to calculate the risk coefficients in Traditional Medicare.  Many commenters protested this so-called "two-way" retrospective chart review requirement.

70.     On May 23, 2014, CMS published its final rule *without* the two-way retrospective chart review requirement.

71.    In August 2016, the Ninth Circuit reversed a district court's dismissal of a complaint and held that an MAO's attestation could be false if it designed its retrospective chart review program "deliberately to avoid identifying erroneously submitted diagnosis codes." *United States ex rel. Swoben v. UnitedHealthcare Ins. Co.*, 848 F.3d 1161, 1175 (9th Cir. 2016).

72.    In 2017, the United States intervened in a lawsuit filed by a former UnitedHealth employee alleging False Claims Act violations in connection with UnitedHealth's retrospective chart review program and retention of payments for diagnosis codes that United allegedly knew were unsupported by medical records. *United States ex rel. Poehling v. UnitedHealth Group, Inc.* ("*Poehling*"), Case 2:16-cv-08697-MWF-SS (C.D. Cal. Nov. 17, 2017) (Dkt. 171).

73.    In June 2019, the Central District of California ordered CMS to produce to plaintiff 22,000 documents related to the proposed two-way retrospective chart review rule and other topics covered by FBT's FOIA Requests.  (Order re: Pending Motions, *Poehling*, C.D. Cal. Case No. 2:16-CV-08679 (Dkt. 336).)

74.    As described above, FBT's FOIA Requests seek production of documents related to the proposed two-way retrospective chart review rule, CMS's decision not to finalize the two-way chart review rule, and the documents produced by CMS in the *Poehling* litigation.  CMS has possession, custody, or control of these documents and should produce them.

***Part C Overpayment Rule***

75.    As part of the same January 2014 rulemaking process in which CMS initially proposed but then withdrew the two-way retrospective chart review rule, CMS also adopted a rule concerning "overpayments" identified by MAOs.

76.    In May 2014, CMS promulgated the MAO-Identified Overpayment Rule, which states that "[i]f an MA organization has identified that it has received an overpayment, the MA

organization must report and return that overpayment" within 60 days of identification unless otherwise directed by CMS. 42 C.F.R. § 422.326(b) & (d). The regulation defines "overpayment" as any premium paid to MAOs for diagnosis codes later determined to be unsubstantiated by medical records. CMS, Medicare Program; Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 29,844, 29,921 (May 23, 2014). But the preamble of the regulation equates each individual unsupported diagnosis code to an overpayment. The MAO-Identified Overpayment Rule does not include an FFS Adjuster or other similar mechanism to account for the fact that CMS does not audit the Traditional Medicare claims data that it uses to create the risk adjustment coefficients. Numerous commenters raised actuarial equivalence-based objections to the proposed MAO-Identified Overpayment Rule.

77.     Notwithstanding these comments, on May 23, 2014, CMS published its Final Rule (or "Part C Overpayment Rule") maintaining the "overpayment" definition and 60-day report and return requirement. 79 Fed. Reg. 29,844, 29,844-968 (May 23, 2014) at AR1235 *et seq.* In adopting the rule, CMS cited "the long-standing risk adjustment data requirement that a diagnosis submitted to CMS by an MA organization for payment purposes must be supported by medical record documentation." 79 Fed. Reg. 29,844 at 29,921-22. CMS did not explain in the Final Rule how the requirement for medical record documentation answered the commenters' concerns about the SSA's requirement of actuarial equivalence and the actuarial standards embodied by that requirement.

78.     In January 2016, UnitedHealth filed an APA lawsuit in the District Court for the District of Columbia against CMS for improperly promulgating the Part C Overpayment Rule. *UnitedHealthcare Ins. Co. v. Azar II*, No. 16-157 (D.D.C. 2016). In that case, Judge Rosemary

M. Collyer, vacated the Part C Overpayment Rule on the grounds that it violated the Social Security Act's actuarial equivalence mandate because CMS systematically devalued payments to MAOs by using unaudited data from Traditional Medicare to set MAO payment rates, but measured MAO "overpayments" from unsupported diagnosis codes based on audited medical records in MA.   *See id.*   The Court also reasoned that CMS's promulgation of the Part C Overpayment Rule was an arbitrary and capricious departure from its 2012 intention to issue an FFS Adjuster.   *Id.*   In January 2020, this same Court reaffirmed this position in denying the government's request to reconsider the Court's prior holding.   *UnitedHealthcare*, No. 16-cv-157 (RMC), 2020 WL 417867 (D.D.C. Jan. 27, 2020).   CMS appealed some aspects of the district court's decision.

79.     In August 2021, the U.S. Court of Appeals for the D.C. Circuit reversed the D.C. district court's decision, holding that actuarial equivalence "does not apply to the Overpayment Rule," is not "a defense against the obligation to refund any individual, known overpayment," and "[a]n unsupported code submitted by [an MAO] . . . triggers overpayment."   *UnitedHealthcare Ins. Co. v. Becerra*, 9 F.4th 868, 885, 890 (D.C. Cir. 2021).   On September 27, 2021, UnitedHealth filed a petition for rehearing, and the decision remains non-final.

80.     As described above, FBT's FOIA Requests seek production of documents related to the Medicare Part C Overpayment Rule, actuarial equivalence, and FFS Adjuster.   CMS has possession, custody, or control of these documents and should produce them.

***Productions to Other FOIA Requesters***

81.     FOIA requesters other than FBT have sought documents from CMS covering the same topics as those in FBT's requests (including as described below in Paragraphs 121 and 122).

FBT has requested these documents, which should be readily available to CMS and not burdensome to re-produce to FBT.  CMS has yet to produce all of these documents.

***CMS's Response to FBT's FOIA Requests***

82.     On May 23, 2018, CMS acknowledged receipt of FOIA Requests One, Two, Three, and Six attached as Exhibits A, B, C and F. True and accurate copies of the CMS acknowledgment letters are attached as Exhibit G.

83.     On May 24, 2018, CMS acknowledged receipt of FOIA Request Five attached as Exhibit E.  A true and accurate copy of the CMS acknowledgment letter is attached as Exhibit H.

84.     CMS has not yet issued a formal acknowledgment of receipt of FOIA Request Four, attached as Exhibit D, although it appears to have assigned FOIA Request Four a PIN and lists FOIA Request Four in its publicly available FOIA Logs.

85.     On June 22, 2018, FBT received a letter from CMS requiring an advanced payment of $120,000 to process the FOIA Requests (the "Invoice").  A true and accurate copy of the CMS fee demand is attached as Exhibit I.

86.     On July 20, FBT responded to CMS's Invoice, stating CMS's June 22, 2018 letter was untimely and beyond the 20-day statutory deadline for responding to the FOIA Requests pursuant to 5 U.S.C. § 552(a)(6)(A), and requesting more information regarding the Invoice on the grounds it must be limited to "reasonable standard charges" pursuant to 5 U.S.C. §552(a)(4)(A)(ii)).

87.     FBT requested information on the financial breakdown of the Invoice and the estimate of hours to complete the search and review process—all of which were missing from the Invoice.  FBT explained that pursuant to 5 U.S.C. § 552(a)(4)(A), CMS is required to promulgate a fee schedule to process the FOIA requests. FBT questioned the reasonableness of the fees stating

that CMS employees' hourly rates range from $23 to $83, and, from the highest to lowest hourly CMS employee rate, CMS's $120,000 fee estimate equates to approximately 1,500 to 5,200 hours of billed search time for the Requests.  FBT further explained that CMS has already produced responsive documents to other FOIA requestors thereby limiting the search and review process. FBT stated that, absent additional information from CMS, including but not limited to: (i) the databases or files to be searched; (ii) the employees involved in the search; (iii) the estimate of the hours required; and (iv) details regarding how the requested documents will be produced, it appeared the $120,000 fee estimate may be improperly inflated to effectively deny access to the documents.  A true and accurate copy of FBT's response to the CMS fee demand is attached as Exhibit J.

88.     Thereafter, on July 25, 2018, Mr. Hugh Gilmore of CMS responded to FBT's fee inquiry, stating that the fee was premised on a "preliminary search of records" and CMS's anticipated review of "voluminous documents."   In part, Mr. Gilmore advised that 90,000 documents surfaced when CMS performed a unilateral keyword search for documents responsive to a single partial request—Item 3 of FOIA Request One for years 2014–2018.  A true and accurate copy of CMS's response to FBT's fee inquiry is attached as Exhibit K.

89.     After reviewing CMS's reply to FBT's fee inquiry, and in an attempt to foreclose any further delay in CMS's production, on August 9, 2018, FBT agreed to tender the $120,000 fee to CMS and requested that by August 25, 2018 CMS (i) begin producing responsive documents on a rolling basis, prioritizing the documents that "CMS already [had] produced to other FOIA requestors," and, therefore, were most readily available; (ii) confirm CMS would produce to FBT "on a rolling basis additional responsive documents based on unique searches [CMS] may be

running"; and (iii) provide "an expected production schedule." A true and accurate copy of FBT's fee confirmation is attached as Exhibit L.

90.     FBT tendered the $120,000 fee to CMS via overnight delivery on August 14, 2018. A true and accurate copy of FBT's letter enclosing the $120,000 fee and confirmation of receipt is attached as Exhibit M.

91.     Following payment of the $120,000 fee, FBT attempted to work with CMS to facilitate production of the requested documents.

92.     On August 16, 2018, FBT contacted CMS and stated that it received confirmation that the $120,000 check was delivered to CMS's office and requested CMS contact FBT if it would like to discuss FBT's August 9, 2018 correspondence.  Mr. Gilmore acknowledged receipt of the fee and stated he would contact FBT "soon as I'm back from leave and catching up with many items."

93.     On September 17, 2018, FBT sent an email to Mr. Gilmore stating that FBT had contacted CMS by email and voicemails on multiple occasions, including but not limited to, communications on August 30, September 4, September 10, and September 14, but had been unable to reach him.  FBT reiterated what was included in the August 9, 2018 correspondence, stated that the FOIA requests have been pending since May 21, 2018, and explained that FBT "would like to work with CMS to avoid filing any type of enforcement action to obtain these documents."

94.     After continued delay, FBT was eventually informed on September 18, 2018, three weeks after FBT's first proposed August 25, 2018 deadline, that that "[p]roduction would be conducted on a rolling basis and we hope to have the first one to you soon."  A true and accurate copy of CMS's acknowledgment of proposed production is attached as Exhibit N.

95.     Despite CMS's statement, FBT did not receive any responsive documents. Therefore, on September 22, 2018, FBT reiterated its request for production and requested that CMS confirm it would produce the readily available documents by September 28, 2018, and provide a timeline for its rolling production by that date.  A true and accurate copy of FBT's reiterated request is attached as Exhibit O.

96.     Over five months passed without any correspondence whatsoever from CMS.  On March 1, 2019, FBT sent CMS a letter regarding CMS's failure to (i) produce any responsive documents, (ii) respond to prior email correspondence from FBT, or (iii) provide any update regarding the status of the FOIA Requests, submitted nearly a year earlier.  FBT's March 1, 2019 letter requested that CMS produce responsive documents by April 1, 2019.

97.     On March 19, 2019, nearly eight months after FBT paid the $120,000 fee, CMS sent FBT its first interim response to five of the six FOIA Requests (Requests One, Two, Four, Five, and Six).  The first interim response enclosed 22 publicly available documents (consisting of 2,080 pages) but did not identify to which FOIA Requests, or parts of each Request, the documents were responsive—a violation of Section 30.14(A) of CMS's FOIA Policy and Procedures Guide, referenced above.  Upon review of the documents, it is not clear which sub-category the provided documents are responsive to, if any.  A true and accurate copy of CMS's March 19, 2019 letter enclosing its first interim response is attached as Exhibit P.

98.     On April 25, 2019, FBT sent CMS a letter identifying the deficiencies in CMS's first interim response and continued deficiencies in responding to the FOIA Requests.  FBT's April 25, 2019 letter requested a rolling production from CMS every thirty days and a production schedule to ensure a reasonable completion date. A true and accurate copy of FBT's April 25, 2019 letter is attached as Exhibit Q.

99.     After receiving no response to FBT's April 25, 2019 letter, FBT contacted CMS by phone on June 14, 2019, and left voicemail messages for Vendetta Dutton on the FOIA Hotline. FBT then called and spoke to a CMS analyst who stated she would leave a message with the CMS Analyst assigned the FOIA Requests to call back.  FBT did not receive a return phone call from any CMS Analyst.

100.     On July 12, 2019, FBT sent CMS another letter regarding the unreturned voicemails and messages and unaddressed deficiencies identified in FBT's April 25, 2019 letter. FBT's July 12, 2019 letter also noted that CMS had been recently ordered by a federal court to produce 22,000 documents by June 20, 2019, in the case captioned *United States ex rel. Poehling v. UnitedHealth Group, Inc.*, Case 2:16-cv-08697-MWF-SS (C.D. Cal. Nov. 17, 2017) (the "*Poehling* Documents"). Many of the 22,000 *Poehling* Documents relate to the FOIA Requests, so FBT requested that the *Poehling* Documents be produced to FBT and that the other production deficiencies be remedied within thirty days.  A true and accurate copy of FBT's July 12, 2019 letter is attached as Exhibit R.

101.     On July 18, 2019, CMS sent FBT its second interim response to the same five of six FOIA Requests.  The second interim response enclosed 15 publicly available documents (consisting of 2,142 pages), and it again did not identify to which FOIA Requests, or parts of each Request, the documents were responsive.  A true and accurate copy of CMS's July 18, 2019 letter enclosing its first interim response is attached as Exhibit S.

102.     On July 31, 2019, FBT sent a letter to CMS regarding the deficiencies in CMS's second interim response and continued deficiencies identified by FBT, which CMS had not acknowledged, and CMS's failure to produce even the *Poehling* Documents to FBT.  FBT's July

31, 2019 letter requested that CMS remedy the deficiencies within thirty days. A true and accurate copy of FBT's July 31, 2019 letter is attached as Exhibit T.

103.    On August 22, 2019, CMS sent FBT its third interim production to the same five of six FOIA Requests.  The third interim response enclosed four spreadsheets (consisting of 1,132 pages) without identifying to which FOIA Requests, or parts of each Request, the spreadsheets were responsive, or how the spreadsheets were generated, which might have indicated their responsiveness.  Without that information, FBT could not ascertain their responsiveness.  CMS stated in its August 22, 2019 letter enclosing the interim production that it had redacted certain fields from the spreadsheet for personal privacy under FOIA Exemption (b)(6). 5 U.S.C. § 552(b)(6).  A true and accurate copy of CMS's August 22, 2019 letter enclosing its third interim response is attached as Exhibit U.

104.    Following CMS's third interim production, on September 30, 2019, FBT sent another letter to CMS regarding the deficiencies in that interim response, as well as the continued deficiencies in CMS's first and second interim responses.  In its September 30, 2019 letter, FBT specifically requested that CMS confirm it was searching for non-publicly available sources of responsive documents, since all of the documents CMS had produced in the year since receiving the FOIA Requests had been publicly available documents. FBT also asked CMS to provide a PIN number for FOIA Request Four (assigned Control No. 052320187010), and confirm that CMS was searching for documents responsive to that Request; FBT had not received any correspondence from CMS referring to FOIA Request Four since receiving CMS's Invoice, and none of CMS's first three interim responses included any reference to FOIA Request Four, despite referencing FBT's other five requests. FBT's September 30, 2019 letter asked CMS to remedy its deficiencies

by October 4, 2019. A true and correct copy of FBT's September 30, 2019 letter is attached as Exhibit V.

105.    On October 15, 2019, CMS sent FBT its fourth interim response, identifying 16 documents (consisting of 851 pages), at least some of which are publicly available, and again without identifying to which FOIA Requests, or parts of each Request, the documents were responsive.  CMS's October 15, 2019 letter stated CMS was producing only 685 of 851 pages in their entirety. CMS withheld in their entirety 163 pages and portions of 1 page under the deliberative process privilege (FOIA Exemption (b)(5)), and withheld portions of 2 pages under the business trade secrets or confidential commercial information privilege (FOIA Exemption (b)(4)).  5 U.S.C. § 552(b)(4)–(b)(5).  Although the October 15, 2019 letter recited the general scope of FOIA exemptions (b)(4) and (b)(5), it offered no explanation to support CMS's assertion of the exemptions. A true and accurate copy of CMS's October 15, 2019 letter is attached as Exhibit W.

106.    On January 23, 2020, CMS sent FBT its fifth interim response, containing 13 documents (consisting of 1,051 pages), again without identifying to which FOIA Requests, or parts of each Request, the documents were responsive.  CMS's January 23, 2020 letter stated CMS was producing only 896 of 1,051 pages in their entirety. CMS withheld 119 pages in their entirety under the deliberative process privilege (FOIA Exemption (b)(5)).  5 U.S.C. § 552(b)(5).  Like CMS's October 15, 2019 letter, the January 23, 2020 letter failed to provide any basis for withholding 119-pages of responsive documents under the deliberative process privilege. CMS did not offer any reason at all for failing to produce the remaining 36 withheld pages identified in

the fifth interim response.[5] A true and accurate copy of CMS's January 23, 2020 letter is attached as Exhibit X.

107.   On March 26, 2020, CMS sent FBT its sixth interim response, identifying 10 documents (consisting of 1,513 pages), once more without identifying to which FOIA Requests, or parts of each Request, the documents were responsive.  CMS's March 26, 2020 letter stated CMS was producing only 1,337 of 1,513 pages in their entirety. CMS withheld in their entirety 163 pages and portions of 7 pages under the deliberative process privilege and for personal privacy (FOIA Exemptions (b)(5)and (b)(6), respectively). 5 U.S.C. § 552(b)(5)–(b)(6).  Although the March 26, 2020 letter recited the general scope of FOIA Exemptions (b)(5) and (b)(6), it offered no explanation as to why those exemptions applied to the material withheld from the production. A true and accurate copy of CMS's March 26, 2020 letter is attached as Exhibit Y.

108.   On February 17, 2021, CMS sent FBT a "Still-Interested" Inquiry for FOIA Request Four, which for the first time provided a PIN for that Request and, for the first time since CMS's Invoice, acknowledged CMS had received that Request.  The February 17, 2021 inquiry demanded a signed, written response from FBT indicating FBT's continued interest in CMS's response to FOIA Request Four within ten (10) calendar days. A true and accurate copy of the February 17, 2021 "Still-Interested" Inquiry is attached as Exhibit Z.

109.   CMS's February 17, 2021 letter threatened to close its inquiry for FOIA Request Four unless FBT reaffirmed its interest in receiving documents within ten (10) calendar days, although the United States Department of Justice has advised "the time period to allow requesters to respond to 'still-interested' inquiries *should be no shorter than thirty (30) working days*."

---

[5] CMS identified 1,051 pages of responsive documents and stated it was producing only 896 in their entireties (1,051–896=155 withheld pages).  CMS stated it withheld 119 pages under exemption (b)(5) (155 –119=36 pages withheld without reason).

*Limitations on Use of "Still-Interested" Inquiries*, Dep't of Justice, https://www.justice.gov/oip/limitations-use-still-interested-inquiries (last visited July 29, 2021) (emphasis in original).

110.     Nevertheless, on February 25, 2021, within the time imposed by the "Still-Interested" Inquiry, FBT returned a signed copy of the February 17, 2021.  A true and accurate copy of the signed, returned version of the February 17, 2021 inquiry is attached as Exhibit AA.

111.     Despite returning the signed letter on February 25, 2021, to date FBT has received no correspondence from CMS regarding Request Four.  And CMS currently lists Request Four as "suspended – pending information from requestor" on its website.  CMS, *Check the Status of Your FOIA Request*, https://www.cms.gov/apps/FOIA/ (last visited October 19, 2021).

112.     On September 3, 2021, FBT sent CMS a final demand letter providing formal notice that it would be filing this Complaint if CMS did not complete its production of responsive documents within 45 days of the letter (October 18, 2021).  A true and accurate copy of FBT's final demand letter is attached as Exhibit BB.

113.     On September 9, 2021, CMS acknowledged receipt of FBT's September 3, 2021, final demand letter via email.

114.     On September 24, 2021, FBT received a letter from CMS dated September 16, 2021, enclosing CMS's seventh interim response, containing 13 documents (totaling 1,097 pages) 11 of which (946 pages) consist of publicly available CMS user guides and training materials related to MA Prescription Drug Plans and Risk Adjustment User Groups.  This response again failed to identify to which FOIA Requests, or parts of each Request, the documents were responsive, and did not reference Request Four.  CMS's September 16, 2021 letter stated CMS was producing only 991 of 1,097 pages in their entirety. CMS withheld portions of 106 pages (the

non-publicly available documents) under the deliberative process privilege (FOIA Exemption (b)(5)), and the personal privacy privilege (FOIA Exemption (b)(6)).  5 U.S.C. § 552(b)(5)–(b)(6). The September 16, 2021 letter recited the general scope of FOIA exemptions (b)(5) and (b)(6) and stated, without any detail, that CMS has weighed public interests in disclosure against individual privacy interests and concluded that the latter outweighs the former. But, again, CMS failed to offer a sufficient explanation to support CMS's assertion of either the exemptions (and the deliberative process privilege in particular). A true and accurate copy of CMS's September 16, 2021 letter is attached as Exhibit CC.

115.    CMS's September 16, 2021 letter and seventh interim production continue to suffer from the same deficiencies outlined numerous times by FBT over the course of three years.

116.    CMS sent no substantive response to FBT's September 3, 2021, final demand letter.

117.    As of the date of the filing of the Complaint, CMS has produced a mere 93 documents, comprising 9,369 pages (of 9,866 pages identified as responsive), almost all of which are publicly available.  CMS has failed to substantively respond to—let alone remediate—the ongoing production gaps and delay.

118.    CMS has not exercised due diligence in searching for or responding to FBT's FOIA Requests.

119.    CMS's total failure to produce anything but a tiny fraction of potentially responsive documents is evidenced by the comparative number of documents both produced in other similar litigation and identified by CMS in a preliminary keyword search in response to FBT's Requests. In the *Poehling* litigation, CMS was ordered to produce 22,000 documents (not pages) to the defendant, and in Hugh Gilmore's July 25, 2018, email to Kandi Hidde of FBT (Exhibit K), CMS identified 90,000 documents (not pages) responsive to one portion of one Request for just a portion

of the inquired time period.  Yet CMS has produced to FBT only 93 documents consisting of less than ten thousand **pages**, many of which were improperly redacted, and the vast majority of which are publicly available.  The inadequacy of CMS's responses is clear and egregious.

120.    CMS's conduct in responding to FBT's FOIA Requests is not an isolated incident. Indeed, CMS's pattern or practice of repeated and long delays in responding to FOIA requests has forced other FOIA requestors to file lawsuits against CMS.

121.    For example, Petrillo sent FOIA requests to CMS on January 15, 2015, and although CMS allegedly acknowledged the existence of such requests in writing on August 24, 2015, CMS did not produce documents for over 3 years and then only after Petrillo filed a lawsuit in this Court on April 14, 2017 to force CMS to comply. *See Petrillo & Powell, PLLC v. U.S. Dept of Health and Human Services*, Case 1:17-cv-00663-KBJ.  Petrillo only agreed to a voluntary dismissal of its suit on February 23, 2021, after years of litigation and oversight by this Court of CMS's productions.

122.    Similarly, Sidley Austin LLP sent FOIA requests to CMS on November 9, December 4, and December 13, 2018, each requesting expedited processing.  CMS allegedly acknowledged the first request on November 13, 2018, but did not acknowledge the other two requests until January 23 and February 26, 2019, and only after Sidley Austin sent CMS correspondence asking for the status of both requests.  CMS also failed to produce any responsive documents to Sidley Austin, offering only interim productions of non-responsive materials before Sidley Austin filed a lawsuit in this Court on July 10, 2020.  *See Sidley Austin (DC) LLP v. Centers for Medicare & Medicaid Servs.*, Case 1:20-cv-01871 (RBW).  After Sidley Austin filed suit, CMS allegedly offered unfulfilled promises to comply with self-set deadlines, inaccurate statements

regarding CMS's search results, and abandoned positions regarding the scope and location of responsive documents.

123.     Through August 3, 2021, CMS still failed to complete its production of responsive documents to Sidley Austin, or even to agree to any concrete schedule for completing its production.  Sidley Austin contended that nothing short of court-imposed deadlines would force CMS to comply with its FOIA obligations, and this Court ultimately issued an order on August 10, 2021, imposing several search and production deadlines on CMS related to a limited scope of documents identified by Sidley Austin as high priority.  (Order, *Sidley Austin*, 1:20-cv-01871-RBW, ECF No. 30 (D.D.C., filed Aug. 10, 2021.)  The Court held a status conference on September 14, 2021, and ordered the parties to file a joint status report on October 15, 2021.  (Order*, Sidley Austin*, 1:20-cv-01871-RBW, ECF No. 30 (D.D.C., filed Sept. 14, 2021.)

124.     On October 15, 2021, Sidley Austin and CMS filed a Joint Status Report with the Court.  (Joint Status Report, *Sidley Austin*, 1:20-cv-01871-RBW, ECF No. 30 (D.D.C., filed Oct. 15, 2021.)  Unsurprisingly, Sidley informed the Court that CMS had failed to make a timely production of even the prioritized documents identified in the Court's August 10, 2021 order, and CMS again requested additional time to complete its production.  (*Id.*)

125.     Without court-imposed directives, CMS will not rectify its incomplete and deficient FOIA responses.  CMS's inexcusable abdication of its FOIA obligations and its dilatory behavior harms FBT's and other FOIA requestors' ability to gain access to documents to which they are entitled by law and undermines the very purpose of FOIA, which is to promote government transparency.  CMS's inaction is particularly harmful here, where it conditioned its lackluster FOIA production attempt on payment of a significant sum—potentially chilling the ability of FOIA

requesters—and despite receiving full payment of that sum has neglected to produce more than a modicum of responsive documents.

## COUNT I: VIOLATION OF FREEDOM OF INFORMATION ACT

126.    FBT incorporates the preceding paragraphs by reference as if fully restated herein.

127.    FBT, through the Requests, asked for records within CMS's control.

128.    FBT has exhausted any applicable administrative remedies.

129.    CMS's failure to timely respond to FBT's Requests violates 5 U.S.C. § 552(a)(6)(A)(i), and CMS's own regulations promulgated thereunder, in that CMS failed to issue a determination within twenty days of FBT's Requests, as statutorily required.

130.    In addition to the twenty-day deadline imposed by 5 U.S.C. § 552(a)(6)(A)(i), 5 U.S.C. § 552(a)(3)(A) more broadly requires CMS to "make . . . records promptly available to any person."

131.    CMS's failure to promptly make available the records sought by FBT's Requests violates 5 U.S.C. § 552(a)(3)(A).

132.    CMS's failure to release the records sought by FBT's Requests violates 5 U.S.C. § 552(a), in that CMS has withheld records responsive to FBT's Requests without proper justification and without any formal acknowledgement of FBT's Request Four.

133.    CMS's withholding of responsive documents purportedly under the deliberative process privilege in FOIA Exemption (b)(5) without describing any foreseeable harm to the agency's processes that would result from disclosure of the withheld information, violates 5 U.S.C. § 552(a).

## COUNT II: REQUEST FOR INJUNCTIVE RELIEF
## COMPELLING CMS TO RESPOND TO FBT'S FOIA REQUESTS

134.    FBT incorporates the preceding paragraphs by reference as if fully restated herein.

135.    Pursuant to 5 U.S.C. § 552(a)(6)(A)(i), CMS has twenty (20) business days after receipt to determine whether it will comply with a FOIA request.  Under certain circumstances, an agency may extend the time limit to up to thirty (30) working days by written notice to the requester.  5 U.S.C. § 552(a)(6)(B)(i).

136.    CMS never sought to extend the time limit to thirty days.

137.    More than three years have passed since CMS received and acknowledged receipt of the FOIA Requests and since FBT paid CMS the $120,000 advance fee.

138.    CMS has responded in an inadequate manner and has produced only approximately 93 documents—most of which are publicly available—to FBT.  CMS was previously ordered to produce 22,000 documents in the *Poehling* matter.  Clearly, CMS has inexplicably failed to produce thousands of documents to FBT that CMS was previously ordered to produce in *Poehling* and other matters.

139.    Because CMS has failed to provide a complete response within the applicable time limits of FOIA, FBT is deemed to have exhausted its administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

140.    FBT has a statutory right to the requested documents, and there is no legal basis for CMS's failure to make them available to FBT.

141.    FBT is entitled to injunctive relief compelling CMS's compliance with FOIA and production of the requested agency documents.

### COUNT III: REQUEST FOR INJUNCTIVE RELIEF
### COMPELLING CMS TO PRODUCE DOCUMENTS PURPORTEDLY WITHHELD
### UNDER THE DELIBERATIVE PROCESS PRIVILEGE

142.    FBT incorporates the preceding paragraphs by reference as if fully restated herein.

143.    In its fourth, fifth, sixth, and seventh interim responses, CMS purports to withhold entire or portions of responsive documents under the deliberative process privilege (FOIA Exemption (b)(5)).

144.    CMS may withhold responsive documents sought under FOIA if it reasonably foresees that disclosure would harm an interest protected by an exemption to FOIA, or if disclosure is prohibited by law.

145.    In asserting the deliberative process privilege, CMS is required to explain with particularity the specific foreseeable harm to the agency processes that would—not could—result from disclosure of the withheld documents.  CMS has offered no such explanation, despite withholding hundreds of pages of responsive documents purportedly under that privilege.

146.    CMS did not properly assert the deliberative process privilege, and the withheld responsive documents should be produced to FBT.

147.    In its September 3, 2021 final demand letter, FBT demanded that CMS withdraw its assertion of the deliberative process privilege and produce any documents previously withheld on that basis, but CMS has not done so.

148.    FBT has a statutory right to the requested documents, and there is no legal basis for CMS's decision to withhold responsive documents under the deliberative process privilege in Exemption (b)(5).

149.    FBT is entitled to injunctive relief compelling CMS's compliance with FOIA via the release and disclosure of the requested agency documents.

### COUNT IV: REQUEST FOR INJUNCTIVE RELIEF
### ENJOINING CMS FROM ITS PATTERN OR PRACTICE OF VIOLATING FOIA

150.    FBT incorporates the preceding paragraphs by reference as if fully restated herein.

151.    CMS has engaged in unreasonable delays in disclosing non-exempt documents, which is a violation of the intent and purpose of FOIA.

152.    Upon information and belief, CMS engages in repeated and long delays as a pattern or practice when interacting with FOIA Requestors, such as Petrillo & Powell and Sidley Austin, which amounts to CMS ignoring its FOIA responsibilities.

153.    FBT's current FOIA requests have been, and are likely to continue to be, subject to that same practice.

154.    FBT is entitled to injunctive relief enjoining CMS from continuing its pattern or practice of violating FOIA.

## REQUESTED RELIEF

WHEREFORE, FBT requests that this Court:

(a)    Order CMS to make the documents requested in FOIA Requests One through Six available to FBT within thirty (30) days of the Court's order;

(b)    Order CMS to make the documents previously withheld by CMS under the deliberative process privilege (FOIA Exemption (b)(5)) available to FBT within thirty (30) days of the Court's order;

(c)    Enjoin CMS from its pattern or practice of violating FOIA's mandate, as evidenced by CMS's repeated long delays responding to FBT's FOIA Requests;

(d)    Award FBT the costs and reasonable attorneys' fees in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

(e)    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,


By: */s/ Joseph M. Ward*
    Joseph M. Ward, #483283
    Jean Paul Yugo Nagashima, # 1029624
    *Attorney for Plaintiff, Frost Brown*
    *Todd LLC*



FROST BROWN TODD LLC

Joseph M. Ward
500 Virginia Street East, Suite 1100
Charleston, WV 25301
Phone: (304)348-2423
Fax: (304)345-0115
jward@fbtlaw.com


Jean Paul Yugo Nagashima
20 F Street NW
Suite 850
Washington, DC 20001
Phone: (202)292-3150
Fax: (202)292-4151
ynagashima@fbtlaw.com